**WHITNEY CROWNE CORPORATION, d/b/a Midnight Rodeo; Payroll Services Corporation a/k/a Associated Club Management, Inc.; and Serena Deal, Individually and as Next Friend of Justin William Deal and Shaelyn Marie Deal, Appellants,**

v.

**GEORGE DISTRIBUTORS, INC., Appellee.**

**No. 07–95–0302–CV.**

Court of Appeals of Texas, Amarillo.

Jan. 8, 1997.

Rehearing Overruled Sept. 18, 1997.

Gibson, Ochsner & Adkins Kenneth S. Muncy, Sheets & Holcomb, Jody G. Sheets, Amarillo, Gassaway, Gurley & Mitchell, Leon Mitchell, Borger, for appellants.

Underwood, Wilson, Berry, Stein & Johnson, Michael H. Loftin, Charles A. Mallard, Delinda R. Johnson, Amarillo, for appellee.

Before BOYD, C.J., QUINN, J., and REYNOLDS, Senior Justice.*

BOYD, Chief Justice.

In this appeal, appellants Serena Deal, individually and as next friend of Justin William Deal and Shaelyn Marie Deal (the Deals), Whitney Crowne Corporation d/b/a

* Charles L. Reynolds, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. § 75.002(a)(1) (Vernon Supp. 1996).

Midnight Rodeo (Midnight Rodeo), and Payroll Services Corporation a/k/a Associated Club Management, Inc. (ACM) challenge a summary judgment in favor of George Distributors, Inc. (GDI). In the suit giving rise to the appeal, the Deals sought recovery for damages they allegedly suffered because of the accidental death of Serena's husband and Justin and Shaelyn's father, Jackson Thomas Deal (J.T. Deal), which, they allege, resulted from the negligent furnishing of alcoholic beverages to J.T. Deal at a time when he was so obviously intoxicated as to present a clear danger to himself and others. The trial court entered a take-nothing summary judgment in favor of GDI against the Deals' negligence claims and against the other defendants on their contribution claims from GDI. We affirm the judgment of the trial court.

In assailing the judgment, the Deals argue the trial court erred in rendering it because 1) GDI owed a duty to its employee J.T. Deal not to provide alcohol at a time when he was obviously intoxicated, 2) GDI was not a social host and owed a duty as a provider of alcohol and breached its duty by providing alcohol to J.T. Deal when he was obviously intoxicated, 3) GDI was acting in a joint enterprise with Midnight Rodeo and therefore owed a duty under Tex.Alco.Bev.Code Ann. § 2.02, and 4) the evidence establishes that GDI and Midnight Rodeo engaged in a civil conspiracy. They also assert 5) the trial court erred in overruling their motion to reconsider and in entering its amended order granting GDI's motion for summary judgment.

In two points, Midnight Rodeo and ACM contend 1) the trial court erred in granting its summary judgment on the contribution claims (asserted by way of cross-claim and, alternatively, third party claim) of the Midnight Rodeo, which 2) prevented Midnight Rodeo from asserting contribution claims against GDI.

A movant for summary judgment is entitled to summary judgment if it demonstrates there is no genuine issue of material fact and it is entitled to judgment as a matter of law. In reviewing whether the summary judgment was proper, we must assume evidence favorable to the non-movant as true, and every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *Nixon v. Mr. Property Management, Inc.,* 690 S.W.2d 546, 548–49 (Tex.1985). Thus, in order for GDI to be entitled to summary judgment, it must have disproved as a matter of law at least one or more of the essential elements of each of the plaintiff's causes of action, *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991), or must establish one or more defenses as a matter of law. *Bryant v. Gulf Oil Corp.,* 694 S.W.2d·443, 445 (Tex.App.—Amarillo 1985, writ ref'd n.r.e.).

A proper discussion of the questions presented in this appeal requires us to make a fact intensive review of the extensive summary judgment evidence in this record. That evidence showed that J.T. Deal was an employee of GDI on October 1, 1992. GDI is a local distributor for the Miller Brewing Company (Miller) and was in the business of distributing Miller Beer and Miller Beer products. In connection with a sales incentive program sponsored by Miller, GDI held an awards banquet on the evening of October 1, 1992. After the banquet, J.T. Deal went to the Midnight Rodeo nightclub and attended a promotion held there to promote the sale of Miller Beer. After J.T. Deal left the Midnight Rodeo and at approximately 11:58 p.m., he was traveling at a high rate of speed on Interstate 40 and failed to negotiate a turn. The pickup he was driving overturned and he was immediately killed. An autopsy revealed his blood alcohol content was .163.

With GDI's summary judgment motion, it attached Kirk George's affidavit and excerpts from Mac Gentleman's October 15, 1993 deposition. In his affidavit, Kirk George (George) averred that he was the president of GDI. According to George, the October 1, 1992 awards dinner was held after normal working hours and lasted from 5:00 p.m. until approximately 6:00 p.m. The dinner consisted of steak and beans and GDI furnished beer and non-alcoholic beverages. Although drinking beer was not a prerequisite or requirement of attending the dinner, persons wishing to drink beer had the option of obtaining a glass of beer by filling their own glass. J.T. Deal was present at the dinner,

but according to the witness "did not appear to be impaired or intoxicated."

GDI had a promotion scheduled at the Midnight Rodeo for the night of October 1, 1992, for the purpose of promoting a Clint Black[1] concert in Amarillo. The promotion was scheduled to run between the hours of 7:00 p.m. and 9:00 p.m. on that night.[2] According to the affidavit, GDI's promotional efforts were limited to the handing out of novelty items such as key chains and bandanas. GDI did not offer any beer or drink specials, it had no control over Midnight Rodeo's operations relating to the sale and/or service of beer or drinks, and it did not have any input concerning such sale or service of beer or drinks.

George also averred that GDI's company policy specifically provided that employees were not required to attend promotions and, despite the fact that J.T. Deal was employed as a salesman, he had no employment obligations that required his attendance at the Midnight Rodeo promotion and he was not paid to be there.

According to George, the only persons who attended the Midnight Rodeo promotion as employees of GDI were George himself, Mac Gentleman, the sales manager of GDI, who appeared in a supervisory capacity, Lisa Hinton, and Tammy Bennett. Lisa Hinton and Tammy Bennett were employed by GDI to appear at the promotion and hand out novelty items such as key chains and bandanas. George also stated that Gentleman was not authorized to buy, as a part of his job description, drinks for employees of GDI, and neither requested nor was paid reimbursement for his drink tab at the Midnight Rodeo.

Attached to George's affidavit were excerpts from GDI'S employee handbook which provided, *inter alia*, that "Employees will *NEVER* be required to attend a bar promotion. The Company does not and will not provide alcoholic beverages for employees during any promotion."

In his deposition excerpts, Gentleman averred that he was the sales manager of GDI and supervised five salesmen, including J.T. Deal. Because he was "out in the market," he did not arrive at the awards banquet until about "six to 6:30," and by this time, the participants had started eating. Gentleman said he did not know if there was a keg of beer, but if there was, he "would say" that either Tony Melugen (a vice-president of GDI), or George would have authorized its opening. He did not believe anyone was intoxicated at the dinner.

According to Gentleman, he picked up Lisa Hinton and Tammy Bennett and took them to the Midnight Rodeo for the promotion. The girls were dressed by GDI and were "to give out key chains that night, bandanas, and that was pretty much it." The promotion was to last until "I think nine, 9:30, whenever we got done with the key chains and the bandanas." After he arrived, other than the Miller girls, the GDI employees he saw were "Casey and Jack (J.T. Deal)," although he was not certain whether they arrived before or after he did. The witness said he saw Deal "maybe two or three times" that night, and that at about 11:00 p.m., Deal asked him for a key chain and a bandana to give to "a girl." Gentleman had set up a "tab" to pay for drinks he bought at the promotion, which ran "120 (dollars) maybe, I don't know, a hundred. They usually range a hundred to a hundred and a half." He then denied that he was reimbursed by GDI for the tab, "because it was my deal." Gentleman did not know when Deal left but discovered Deal's van was gone when he, Gentleman, left the bar accompanied by the Miller girls.

Gentleman acknowledged that on occasion George had given him money to buy beer for customers, but said that if he had bought beer for the salesmen, he had paid for them because "it's not company policy for us to do such." When queried whether he had bought J.T. Deal any beer that night, his reply was "I believe one beer, maybe one beer," and that Deal had told him that "he had plenty of money, and he didn't need

---

1. Clint Black is a nationally known country music singer who at the time of the promotion was a national spokesman for Miller.

2. According to George, just after 9:00 p.m., he told Gentleman to "wrap up" the promotion and it ended shortly thereafter.

anybody buying his beer." He also averred that with regard to sales personnel attendance at promotions, "[i]t was common knowledge, you did not have to go to it. You went on your own, under your own free will."

When queried as to J.T. Deal's demeanor when Gentleman last saw him at the Midnight Rodeo, his reply was:

> I'm sure he had been drinking, as far as reading him and knowing—he wasn't, you know, falling all over the place or slurring that I recall, you know. I mean I feel pretty bad about it that I didn't recognize his—his problem that he had that night. So he seemed—he seemed all right to me. He seemed like I guess a regular person that would drink in a bar, and by the end of the evening, you know, some people handle it well and others can't.

Also included with the amended motion was Lisa Hinton's affidavit. She averred that she was employed as a "Lite Force" girl on the night in question and that she and another "Lite Force" girl were employed to hand out Clint Black key chains and bandanas for a Miller promotion. She said the girls were working under the direction of Gentleman, who was the only other Miller employee involved in the promotion as far as she could tell, and she thought she and the "other girl" were the only ones being paid. Hinton also said that while she and Gentleman were waiting at the GDI warehouse for the other girl to arrive, she recalled J.T. Deal asking Gentleman if he could attend the promotion, and Gentleman "basically" told Deal to "do what you want, but you are not required to go." Hinton said she only saw J.T. Deal on a couple of occasions that night when she borrowed cigarettes from him. He was *not wearing any Miller clothing or accessories* and "was not working the promotion with us."

By excerpts from her deposition, Tammy Bennett testified that she was employed by Gentleman to be with Lisa Hinton at the promotion at Midnight Rodeo. She said they arrived with Gentleman at about 8:00 p.m. and left about 12:00 a.m. Her description of what they did was "[W]e walked around and visited with a few people. Told them about the concert that was going to be on Friday night. Handed out some bandanas and key chains." She stated that the "event" lasted until about 9:30 p.m., that she passed out her last item about that time, and that she last saw J.T. Deal at about 11:30 p.m. She added that she had seen Gentleman and J.T. Deal in the "same area" about three times, and that her purpose as a "Miller girl" was to encourage people to drink Miller products. She also said she did not know whether or not J.T. Deal was drunk on that night. She saw him with one drink in front of him but did not see him drink it.

The Deals attached the affidavit of Lyn Gentleman to their response. In her affidavit, she said she was present at the Midnight Rodeo with her then husband, Mac. He set up a "Miller Beer" tab with Stephanie Black, a bartender employed by the Midnight Rodeo. She averred that Gentleman purchased drinks for various patrons and customers of the Midnight Rodeo and that he purchased beer for J.T. Deal and Casey Jefferies. She said she saw J.T. Deal at various times throughout the evening, the last time being approximately 10:00 p.m, and that "[h]e (Deal) obviously had enough alcoholic beverages to drink to become happy and silly. He obviously was not sober. I saw him on at least three different occasions throughout the evening, each time with a different drink in his hand."

By excerpts from her deposition, Kelly Boland testified that she had been employed by the Midnight Rodeo. On occasion, she had refused to serve intoxicated customers, pointed them out, and told other bartenders and waitresses not to serve them.

By affidavit, Casey Jefferies averred that he consumed beer purchased on the Miller tab until Stephanie Black refused to serve him any more beverages, and he then purchased alcoholic beverages from other bartenders and waitresses. He "was intoxicated most of the evening, too intoxicated to notice Jackson T. Deal's condition." The last time he saw J.T. Deal was about 11:00 p.m.

Robert D. Harp averred that he was employed as a truck driver by GDI. He attended the "Texas Toughest" dinner, saw J.T. Deal drink at least five beers there, and

concluded Deal was "obviously impaired by the beer that he drank." He arrived at the Midnight Rodeo about 9:00—9:30 p.m. and spent the next hour and a half with J.T. Deal. He said Deal drank at least two beers while the affiant was with him and "then started drinking mixed drinks. He was buying the drinks at the bar next to the front door. From the time I arrived, Jack's behavior was obviously different than when he was sober. He was talking loudly and very fast. His speech was slurred." He also stated that prior to Harp's leaving at about 10:45 p.m., Deal became "very intoxicated," but Midnight Rodeo continued to serve him drinks. Harp said he knew J.T. Deal should not be driving home and that he was assured by the people remaining at the Midnight Rodeo "that someone would take Jackson T. Deal home."

The Deals also attached Darin Rouse's affidavit. He averred that he was employed by GDI from 1988 through 1993, and that he attended the awards dinner called "Texas Toughest" on October 1, 1992. According to Rouse, all the employees of GDI were present, no one was allowed to bring guests or family members, and no one other than employees or officers of GDI were present. He sat and ate with J.T. Deal during the dinner and said that both of them drank "approximately seven to eight beers from 16 ounce glasses" during the dinner.

Rouse understood from previous dealings with GDI that in order to advance in the company, Gentleman, the sales manager, "preferred for us to drink and to drink a lot of alcoholic beverages." He testified that the salesmen, truck drivers, and merchandisers would attend promotions, the purpose of which was to encourage the patrons of the various bars and saloons to purchase and consume large quantities of Miller alcoholic products. He averred that he knew that company employees were criticized by Gentleman if they "did not drink and did not drink a lot of alcoholic beverages at the promotions."

According to Rouse, the "Texas Toughest" dinner began at approximately 4:30 in the afternoon when George opened a keg of beer, which remained open and available until approximately 6:30 p.m. No one supervised or limited the amount of beer that could be consumed. He averred that J.T. Deal "was obviously affected and impaired as a result of the alcohol that he drank. His speech was slurred and his eyes were red. He continued to drink beer at Texas Toughest after he appeared to be intoxicated."

Rouse also swore that he saw J.T. Deal as he spoke to Gentleman "to confirm that Mac Gentleman wanted Jackson T. Deal to be at the promotion at the Midnight Rodeo." He opined that at each of the promotions he attended, GDI always purchased the beer and alcoholic beverages for the promotions and he "observed Jackson T. Deal leaving Texas Toughest in a state of obvious intoxication." He also said that he had been told by Gentleman that if he wanted to keep his job, he should lie about the amount of alcoholic beverages he drank at the promotion. He concluded by stating that the "Texas Toughest" was payment for the hard work the sales force did in promoting Miller Beer.

In their response, the Deals also attached portions of Gentleman's October 15, 1993 and May 11, 1995 depositions. In the October 15, 1993 excerpt, Gentleman said that his duties included supervising the sales personnel and acting as a "special events coordinator." He defined a "special event" as being something like "Funfest or Civic Center events." In coordinating such events, he would find people to work the events and set up beer kegs and dispensing devices.

Gentleman said he talked to J.T. Deal later that night "about his drinking mixed drinks," and told him that George had shown up and "it didn't look good for Jack to be drinking a mixed drink when Miller Light beer is what pays his salary." He said that this remark "ticked him off a little," and he did not see Deal "for a long time after that."

In the May 11, 1995 excerpt, Gentleman testified that the beer he bought J.T. Deal that night was bought soon after Gentleman arrived at the Midnight Rodeo "when my tab was set up." He reiterated that Deal was not required to be at the Midnight Rodeo that night and was not working, but acknowledged that as Deal's "immediate supervisor,"

there was a "special relationship" between them.

The Deals also attached to their response an excerpt from George's October 15, 1993 deposition. He stated that at the October 1, 1992 awards dinner, there were at least 15 steaks cooked and he cooked all but two of them. He also said that all present received a steak "before it was said and done," but the incentive of the contest was to make the losers think they were going to have to eat beans in front of the winning team. The winning team from the "Texas Toughest" contest was to be flown to Dallas on October 3, 1993.

George said that the keg furnished at the activity was a sixteen gallon half barrel of Miller Light beer. With the *caveat* that he was referring to persons voluntarily present at his bar promotions, he commented that he "would want them to have my product in their hands (sic)." Under examination by his attorney, George said that with reference to his employees, even though he would want them "to have Miller product" in hand, he would not want them to become intoxicated because it would tarnish their image and "it would probably deter the relationships we have with that particular account because it could put that account in jeopardy."

The Deals also attached excerpts from George's May 9, 1995 deposition. He acknowledged that the purpose of the "Texas Toughest" competition was, at least initially, a "kind of morale builder and an encouragement and an inducement to the employees to carry out their jobs." However, J.T. Deal was on the team that lost and would not get the winning team's reward of a trip to Dallas for a casino night. The Miller Brewing Company furnished the guidelines, etc., and made a requirement that a distributor must have such an in-house contest to participate in a state wide contest; however, George said, they did not tell him how to conduct the beef and beans dinner.

George acknowledged that all of GDI's employees were present at the dinner with the exception of the warehouse employees. He also said that although the company passed along Miller Brewing Company programs that dealt with drinking and driving, GDI employees were not trained in identifying intoxication or knowing the effects of alcohol on others.

Also included in the response were excerpts from the January 10, 1995 deposition of Steven Scott Yaeger, the general manager of the Midnight Rodeo. He was not aware whether George had a tab at the Midnight Rodeo but said that George was buying drinks for people on Gentleman's tab. He then opined that drinks were bought for about 50 people. He said the purpose of promotions at the nightclub was to induce people to come to the club, and that one way he increased profits of the club was by selling alcohol.

The Deals also produced an affidavit of John F. Grimes, a toxicologist with nineteen years experience in toxicology. In his opinion, after examining various suit documents, the amount of alcohol consumed by J.T. Deal would "cause him to exhibit clearly observable symptoms of intoxication." He concurred with the investigating officers' conclusion that intoxication was the cause of the accident in which J.T. Deal died.

Serena Deal averred in an affidavit that on the night in question, J.T. Deal was employed by GDI as a salesman, and that he told her he would have to go to a promotion at the Midnight Rodeo, one of his accounts for GDI.

All the Deals' claims hinge upon the threshold question of whether GDI owed a legal duty to J.T. Deal. This is a question of law for the court to decide. *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307 (Tex.1983). As a general rule, a person is under no duty to control the conduct of another, even if he has the practical ability to exercise such control. *Id.* at 309 (citing Restatement (Second) of Torts § 315 (1965)). However, certain relationships do impose, as a matter of law, certain duties upon parties. In determining whether a defendant is under a duty, the court will consider several interrelated factors, including the risk, foreseeability, and likelihood of injury weighted against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the

burden on the defendant. *Id.* Of all these factors, foreseeability of the risk is "the foremost and dominant consideration." *El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex. 1987).

■ The Deals cite the *Otis* case in advancing their first point theory that GDI owed a duty to J.T. Deal as its employee not to provide him alcohol at a time when he was obviously intoxicated. More specifically, they cite the pronouncement that a duty exists "when, because of an employee's incapacity, an employer exercises control over the employee...." *Otis,* 668 S.W.2d at 311. The duty is described as "a duty to take such action as a reasonably prudent employer under the same or similar circumstances would take to prevent the employee from causing an unreasonable risk of harm to others." *Id.*

Recognizing that the *Otis* rule as articulated only encompasses risk of harm to others, the Deals argue that the duty was correctly extended to include the risk of harm to the individual employee in *Spruiell v. Schlumberger,* 809 S.W.2d 935 (Tex.App.—Texarkana 1991, no writ). They suggest that this is a case in which a special relationship indicating control, thus creating a duty, should be recognized. That suggestion warrants a study of *Spruiell.* William Spruiell was an employee of Schlumberger Well Services, a division of Schlumberger Technology Corporation (Schlumberger). He and his wife brought an action against Schlumberger to recover for injuries incurred in an automobile accident after Spruiell and a friend became intoxicated at a chili cook-off held on Schlumberger's premises. As relevant here, he alleged that he was informed by higher-ups in the company that in order for him to move up and progress in the company, he needed to more actively participate in more company functions. He purchased tickets to the function at the company cafeteria from a company employee, the cook-off was held on company property, and he was told by his immediate supervisor that he would be suspended for two weeks because of his conduct at the cook-off.

By affidavit, Spruiell averred that he did not want to leave the event because he knew that neither he nor his friend could drive

safely, so his wife was coming back to pick him up. However, he averred that he was "ordered to leave the premises, that he was actually placed in Blaser's (his friend) truck by a Schlumberger employee and a Schlumberger security guard, and he 'would get in trouble with' his employer if he did not obey the employee." *Id.* at 939. Schlumberger controverted these averments by denying that Spruiell was told to leave the premises or that the named employee had any supervisory authority over Spruiell. It was in light of the testimony Spruiell was compelled to leave the premises when he was intoxicated that the *Spruiell* court determined that common law negligence fact questions existed as to whether Schlumberger placed Spruiell in the truck in a drunken state, and if so, whether that was an act of negligence. *Id.* at 940.

Even viewed in the light in which we must view it, we do not find the summary judgment evidence surrounding J.T. Deal's employment obligations as sufficiently similar to that before the *Spruiell* court to make its reasoning applicable here. In the absence of the type of special relationship discussed in the *Otis* and *Spruiell* courts, the rule is that there is no duty to control the conduct of third persons. Indeed, in *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990), the court explained that its decision in *Otis* was premised on "the employer's *negligent exercise of control* over the employee" rather than a general duty to prevent intoxicated individuals from driving. *Id.* at 526 (emphasis in original); *see also Graff v. Beard,* 858 S.W.2d 918, 920 (Tex.1993).

■ The Deals also argue that under the circumstances of this case, GDI "was not a social host and owed a duty as a provider of alcohol and breached its duty by providing alcohol to JACKSON THOMAS DEAL when he was obviously intoxicated." For discussion purposes, we will first consider GDI's liability, if any, arising from the awards dinner.

Section 2.01 of the Alcoholic Beverage Code, commonly known as the Dram Shop Act, provides:

In this chapter:

(1) "Provider" means a person who sells or serves an alcoholic beverage under authority of a license or permit issued under the terms of this code or who otherwise sells an alcoholic beverage to an individual.

(2) "Provision" includes, but is not limited to, the sale or service of an alcoholic beverage.

Tex.Alco.Bev.Code Ann. § 2.01 (Vernon 1995). Section 2.02, in relevant part, provides:

(b) Providing, selling, or serving an alcoholic beverage may be made the basis of a statutory cause of action under this chapter ... upon proof that:

(1) at the time the provision occurred it was apparent to the provider that the individual being sold, served, or provided with an alcoholic beverage was obviously intoxicated to the extent that he presented a clear danger to himself and others; and

(2) the intoxication of the recipient of the alcoholic beverage was the proximate cause of the damages suffered.

Tex.Alco.Bev.Code Ann. § 2.02 (Vernon 1995). Section 2.03 provides:

The liability of providers under this chapter for the actions of their customers, members, or guests who are or become intoxicated is in lieu of common law or other statutory law warranties and duties of providers of alcoholic beverages. This chapter does not impose obligations on a provider of alcoholic beverages other than those expressly stated in this chapter. This chapter provides the exclusive cause of action for providing an alcoholic beverage to a person 18 years of age or older.

Tex.Alco.Bev.Code Ann. § 2.03 (Vernon 1995). Section 101.63(a) provides that:

(a) A person commits an offense if he knowingly sells an alcoholic beverage to an habitual drunkard or an intoxicated or insane person.

Tex.Alco.Bev.Code Ann. § 101.63 (Vernon 1995).

In argument under this point, the Deals posit that under the summary judgment evidence, the Texas Toughest dinner was payment for GDI employees' hard work, and viewed in that light, was a commercial transaction "and is therefore included in the Dram Shop Act as 'providing an alcoholic beverage.'" In support of that argument, they cite another holding of the *Spruiell* court. The plaintiff in that case also alleged that his employer was negligent as a matter of law for violating § 101.63 of the Act. The employer (Schlumberger) contended that § 101.63, and therefore the Act, was not applicable to it inasmuch as it was not a licensee within the purview of the Act.

In considering that question, the *Spruiell* court held that to apply § 101.63 only to licensees under the Act would "reward those who violated the law by failing to obtain licenses and those who allow their licenses to expire." 809 S.W.2d at 938. It concluded that the conduct the Legislature was endeavoring to regulate by the statute was not that of obtaining a license but was, rather, "the conduct of selling an alcoholic beverage to individuals who are intoxicated." *Id.* That being true, it concluded that the controlling factor was whether Schlumberger was selling alcoholic beverages to an intoxicated person, and if it had, it would be deemed negligent as a matter of law because it violated the law.

Spruiell contended by affidavit that the purchase price of the beer consumed by him was part of his $4.00 admission price; however, Schlumberger contended the admission fee was to cover costs of the band, food, and security guards, while "draft beer was available at the cook-off at no charge." *Id.* at 939. The court concluded that the affidavits presented a dispute on a material fact issue, thereby preventing a summary judgment. *Id.* at 938–39.

In opposing the Deals' argument, GDI first cites the holding in *Schmidt v. Centex Beverage Inc.*, 825 S.W.2d 791 (Tex.App.—Austin 1992, no writ). In that case, the plaintiff had trespassed upon the grounds of the Austin Aqua Fest, was confronted by a group of people including Austin Aqua Fest volunteers, and during the ensuing struggle suffered a broken neck and subsequent paralysis. In his suit, he alleged that the volunteers who confronted him were intoxicated and belligerent as a result of Aqua Fest's policy of providing free beer to its volunteer

workers, which was made possible by the wholesaler distributor's sale of beer to Aqua Fest. Noting that § 2.02 of the Act only applied to "providers" who sold or served an alcoholic beverage to an individual, the court held that a cause of action under that section did not extend to a wholesale beer distributor "under these facts."

We agree with the Austin court's decision under those facts, and note that the court pointed out that there was no summary judgment evidence showing that the distributor provided alcoholic beverages to individuals who were so obviously intoxicated as to constitute a danger to themselves or to others.[3] However, the Deals' contention under this point is not an attempt to involve GDI merely as a wholesaler. It involves a different question. The gist of their argument is that because the awards dinner was in payment for the hard work of the employees, including J.T. Deal, it was the functional equivalent of a direct sale to them, bringing GDI within the purview of § 101.63, as well as § 2.02.

In advancing their functional equivalent argument, as we have noted, the Deals argue "[t]he beer and the food were in **payment** of the sales force's hard work," and "[a] logical inference is that GDI provided alcohol for valuable consideration to its employees and that created the duty as imposed under Tex. Alco.Bev.Code Ann. § 2.02." (emphasis in original). We disagree.

The awards banquet, in its essence, was a social event. The banquet was gratuitously given to the attendants and, in contrast to *Spruiell*, there is nothing in the record indicating that the participants paid any money consideration for the opportunity to attend. Thus, under the facts before us, GDI's position in hosting the awards banquet was analogous to that of a social host.

The record before us does not show that GDI ever exercised any control in requiring J.T. Deal to leave the awards dinner, nor does the evidence suggest that he was in an obviously intoxicated condition when he left the dinner. Thus, with respect to the dinner, the record does not contain evidence suffi-cient to show an exception to the general rule that GDI had no legal duty to control the actions of J.T. Deal.

■ Having made that determination, it next becomes necessary for us to consider the Deals' contention that GDI was "acting in a joint enterprise with MIDNIGHT RODEO and therefore owed a duty under Tex. Alco.Bev.Code Ann. § 2.02." The gist of the Deals' argument here is that GDI was engaged in a promotion with Midnight Rodeo that evening, they had a common purpose to sell Miller products, and there was a common pecuniary interest in that both entities were going to make a profit from the sale of those products.

■ In making that argument, the Deals are attempting to show an exception to the rule that wholesale distributors generally have neither the right to control the amount of alcohol served to a retail customer, nor the duty to do so. *See Schmidt v. Centex Beverage, Inc.*, 825 S.W.2d at 793. In espousing their proposition that such an exception exists, the Deals primarily cite and rely upon *Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716 (Tex.1995). We agree that the rationale and reasoning employed in that case is applicable here. In *Triplex*, the court explicated that in order to establish a joint enterprise, proof must be made that the alleged participants had: 1) an express agreement, 2) a common purpose, 3) a common pecuniary interest, and 4) an equal right to control the enterprise. *Id.* at 718.

In the *Triplex* case, a radio station owned by Triplex had collaborated for about seven years with the Cowboy Palace, Inc. (the Palace) on a weekly ladies' night event to be held at the Palace. The parties had worked together closely to make the ladies' night successful. The Palace sought to increase patronage and the radio station sought to increase its advertising revenue. The station assigned a disc jockey to the Palace for live remote broadcasts during the event and the disc jockey was responsible for making announcements over the public address system

---

3. Parenthetically, although it is not determinative of the questions before us, we find persuasive the *Spruiell* court's reasoning that if an individual or entity who was not a licensee under the Act otherwise violated § 101.63, that fact alone would not defeat liability under the section.

informing patrons at the Palace of drink and other promotions which encouraged patrons to go to the bar. Over the seven-year period, there was evidence of other joint promotions, including the appearance of the radio station's mascot at the Palace. There was also evidence that the disc jockey was aware of underage drinking at the club and had witnessed people becoming intoxicated at the club.

On the night of the incident giving rise to the Triplex suit, a regular patron of the club had been served some sixteen or seventeen mixed drinks and prior to leaving the club, exhibited signs that he was highly intoxicated. When he left the club, he drove at a high rate of speed and was involved in an accident that injured two police officers, the plaintiffs in the suit.

In considering the joint enterprise question, the supreme court said that even assuming the above evidence was sufficient to satisfy the first three prongs of the test, "there [was] no evidence of an equal right to direct and control the enterprise to justify the imposition of joint enterprise liability." *Id.* at 718. In support of that conclusion, the court noted there "was no evidence that (the radio station) had a contractual right of control, or exercised any right of control over who was served, admitted, or ejected" at the club. *Id.* at 719.

The Deals attempt to distinguish *Triplex* by asserting that the fact that a tab was established in Gentleman's name, and because Gentleman made the decision as to who would drink on the tab, there was evidence that the individuals who purchased on the tab were under the control of GDI and its employees. Thus, they argue, a logical inference from the evidence is that GDI had as much a voice in the sale of alcohol as Midnight Rodeo. We disagree.

Even assuming arguendo, in spite of the uncontroverted testimony of Gentleman to the contrary, that GDI authorized the tab and would pay for drinks purchased on the tab, that alone is not sufficient to prove that GDI had an equal right to control the activi-

ties being conducted at the club, including, *inter alia,* the right to decide who should be served, how much liquor they should be served, or who should actually be admitted to the club. In sum, we hold, as did the court in *Triplex,* that there is no evidence showing the fourth prong of the joint enterprise test.[4]

■ The Deals also assert the trial court erred in its decision because under the evidence there is a fact question whether GDI and the Midnight Rodeo were engaged in a civil conspiracy. Again, we find *Triplex* helpful in resolving this question. Our supreme court has defined a civil conspiracy as "a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *See Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex.1983).

Our prior discussion of the Deals' arguments foreshadows our disposition of this one. For the reasons we have discussed, nothing in the summary evidence shows that GDI and Midnight Rodeo entered into a joint enterprise or a combination to serve alcohol to intoxicated persons, in particular J.T. Deal. This, of course, is the gist of the Deals' argument. We find that the trial court did not err in its evident conclusion that there was no evidence indicating such a civil conspiracy.

In conclusion, for the reasons we have discussed, we find the trial court did not err in entering its judgment. Accordingly, we overrule all the Deals' points of error, including their fifth point asserting that the trial court erred in overruling the motion to reconsider and entering an amended order granting GDI's summary judgment. Because we have found that GDI did not violate any duty owed by it, we also overrule the Midnight Rodeo's points of error.

The judgment of the trial court is affirmed.

---

4. We also note that the summary judgment evidence shows that only one drink was furnished to J.T. Deal on Gentleman's tab.